IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | **Chapter 11** |
| **H.H. Holmes Testing Laboratories,** | ) | **Case No. 10-55500** |
| Inc., <u>et al.</u>, | ) | **(Jointly Administered)** |
| | ) | |
| Debtors. | ) | **Judge Susan Pierson Sonderby** |
| | ) | |

### NOTICE OF MOTION

To:     Parties on the Service List

PLEASE TAKE NOTICE that on December 21, 2010, at the hour of 10:00 a.m., or as soon thereafter as counsel may be heard, we shall appear before the Honorable Susan Pierson Sonderby, Bankruptcy Judge for the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, Room 638, 219 South Dearborn Street, Chicago, Illinois, or before such other judge as may be sitting in her place and stead, and shall then and there present **EMERGENCY MOTION OF THE DEBTOR FOR AN ORDER (A) AUTHORIZING THE DEBTOR TO USE CASH COLLATERAL, (B) AUTHORIZING THE DEBTOR TO OBTAIN POST-PETITION FINANCING, (C) GRANTING SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT 11 U.S.C. §§ 105(a), 364(c), 364(d) AND 507(b); (D) MODIFYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362; AND (E) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001,** a copy of which is herewith served upon you.

DATED:  December 20, 2010          H.H. HOLMES TESTING LABORATORIES, INC.


                                   By:     /s/Cheryl Tama Oblander
                                           One of Its Attorneys

Neal L. Wolf (ARDC No. 6186961)
Cheryl Tama Oblander (ARDC No. 6199464)
Butler Rubin Saltarelli & Boyd LLP
70 West Madison Street, Suite 1800
Chicago, IL 60602
Phone:  312-444-9660 (main)
Fax:  312-444-9287 (main)

*Counsel for Debtors and Debtors-in-Possession*

470759v1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | **Chapter 11** |
| **H.H. Holmes Testing Laboratories,** | ) | **Case No. 10-55500** |
| **Inc., <u>et al.</u>,** | ) | **(Jointly Administered)** |
| | ) | |
| Debtors. | ) | **Judge Susan Pierson Sonderby** |
| | ) | |
| | ) | |

### CERTIFICATE OF SERVICE

Cheryl Tama Oblander, an attorney, certifies that on December 20, 2010, she caused a copy of the **NOTICE** and **EMERGENCY MOTION OF THE DEBTOR FOR AN ORDER (A) AUTHORIZING THE DEBTOR TO USE CASH COLLATERAL, (B) AUTHORIZING THE DEBTOR TO OBTAIN POST-PETITION FINANCING, (C) GRANTING SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT 11 U.S.C. §§ 105(a), 364(c), 364(d) AND 507(b); (D) MODIFYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362; AND (E) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001**to be served as reflected in the attached Service List.

DATED:  December 20, 2010

_____/s/Cheryl Tama Oblander_____
Cheryl Tama Oblander

Neal L. Wolf (ARDC No. 6186961)
Cheryl Tama Oblander (ARDC No. 6199464)
Butler Rubin Saltarelli & Boyd LLP
70 West Madison Street, Suite 1800
Chicago, IL 60602
Phone:  312-444-9660 (main)
Fax:  312-444-9287 (main)

*Counsel for Debtors and Debtors-in-Possession*

470762v1

**Service List**
**H.H. Holmes Testing Laboratories, Inc.**
**and Nelson Leasing**

Holmes Testing Laboratories, Inc.
170 Shepard Ave. #A
Wheeling, IL 60090-6061
*Via First Class U.S. Mail*

Nelson Leasing
170 Shepard Ave. #A
Wheeling, IL 60090-6061
*Via First Class U.S. Mail*

Office of the U.S. Trustee
Region 11
219 S. Dearborn St., Room 873
Chicago, IL 60604
*Via Fax: 312-886-5794*

AJAX Environmental & Safety Supply,
Inc.
2537 S. Gessner, Ste. 128
Houston, TX 77063
*Via First Class U.S. Mail*

ALS Laboratory Group
P.O. Box 975444
Dallas, TX 75397
*Via First Class U.S. Mail*

American Express
BOX 0001
Los Angeles, CA 90096-0001
*Via First Class U.S. Mail*

AT&T
P.O. Box 8100
Aurora, IL 60507-8100
*Via First Class U.S. Mail*

Bank of Kenosha
P.O. Box 548
Kenosha, WI 53141-0548
*Via First Class U.S. Mail*

Gabriel Environmental Services
1421 N. Elston
Chicago, IL 60646
*Via First Class U.S. Mail*

GE Capital
P.O. Box 802585
Chicago, IL 60680-2585
*Via First Class U.S. Mail*

GMAC
P.O. Box 380902
Bloomington, MN 55438-0902
*Via First Class U.S. Mail*

IDES
P.O. Box 19299
Springfield, IL 62794-9299
*Via First Class U.S. Mail*

Illinois Department of Revenue
P.O. Box 19447
Springfield, IL 62794-9447
*Via First Class U.S. Mail*

Internal Revenue Service
P. O. Box 804522
Cincinnati, OH 45280-4522
*Via First Class U.S. Mail*

Lamb, Little & Co.
1101 Perimeter Dr., Ste. 500
Schaumburg, IL 60173
*Via First Class U.S. Mail*

LPSR LLC
6723 Bridge St.
Fort Worth, TX 76112
*Via First Class U.S. Mail*

John A. Benson, Jr.
Belongia, Shapiro & Franklin, LLP
20 S. Clark St., #300
Chicago, IL 60603
*Via ECF E-mail*

Best Drilling Services, Inc.
P.O. Box 845
Friendswood, TX 77549
*Via First Class U.S. Mail*

CenTrust Bank, N.A.
385 Waukegan Rd.
Northbrook, IL 60062
*Via First Class U.S. Mail*

Cook County Treasurer
P.O. Box 4488
Carol Stream, IL 60197
*Via First Class U.S. Mail*

Daimler Chrysler Services
DC Truck Financial
13650 Heritage Parkway
Haltom City, TX 76117
*Via First Class U.S. Mail*

Data Device, Inc.
1919 S. Highland Ave.
Suite 320B
Lombard, IL 60148
*Via First Class U.S. Mail*

Deutsch, Levy & Engel Chartered
225 W. Washington St. - Ste. 1700
Chicago, IL 60606
*Via First Class U.S. Mail*

Elm Tree Systems, LLC
4300 Lincoln Blvd.
Oklahoma City, OK 73105
*Via First Class U.S. Mail*

Mandes Inspection & Testing
14403 A East Freeway
Houston, TX 77015
*Via First Class U.S. Mail*

Manifest Funding Services
1450 Channel Parkway
Marshall, MN 56258
*Via First Class U.S. Mail*

Midwest Operating Engineers
6150 Joliet Rd.
Countryside, IL 60525-3994
*Via First Class U.S. Mail*

Sprint
P.O. Box 4181
Carol Stream, IL 60197-4181
*Via First Class U.S. Mail*

SWCA Environmental Consultants
3033 N. Central Ave.
Suite 145
Phoenix, AZ 85012
*Via First Class U.S. Mail*

Wells Fargo Financial
300 Tri-State International
Suite 400
Lincolnshire, IL 60069-4417
*Via First Class U.S. Mail*

Wilson Richardson LLC
1406 Halsey Way Suite 110
Carrollton, TX 75007
*Via First Class U.S. Mail*

Wisconsin Department of Revenue
P. O. Box 930931
Milwaukee, WI 53293-0931
*Via First Class U.S. Mail*

Ford Motor Company
P.O. Box 537901
Livonia, MI 48153-7901
*Via First Class U.S. Mail*

470771v1

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

In Re:  H. H. Holmes Testing Laboratories, Inc.      )
                                                      )    Case No.  10-55500
        Debtor(s)                                     )

## CERTIFICATION CONCERNING EMERGENCY MOTION

I hereby certify that I have carefully examined this matter and that there is a true

necessity for an emergency motion.

The reason this must be heard as an emergency matter is as follows:

Unless and until a court order is entered approving the use of cash collateral as well as DIP financing,
the Debtors will be unable to pay any of their operating expenses.  If Debtors are unable to do do so,
Debtors will be unable to pay for goods and services which it needs to have in order to maintain its
business operations.  Debtors will be compelled to shut their doors and let go some 50 employees.

I certify further that I have made a good faith effort to resolve this matter without a

hearing.

                                              /s/ Cheryl Tama Oblander
                                              Counsel for movant

Dated:    December 20, 2011

emerg.motion          ilnb: October 1,1999          Form Order No. 6

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | **Chapter 11** |
| **H.H. Holmes Testing Laboratories,** | ) | **Case No. 10-55500** |
| **Inc., et al.,** | ) | **(Jointly Administered)** |
| | ) | |
| Debtors. | ) | **Judge Susan Pierson Sonderby** |
| | ) | |
| | ) | |

**EMERGENCY MOTION OF THE DEBTOR FOR AN ORDER (A) AUTHORIZING THE DEBTOR TO USE CASH COLLATERAL, (B) AUTHORIZING THE DEBTOR TO OBTAIN POST-PETITION FINANCING, (C) GRANTING SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT 11 U.S.C. §§ 105(a), 364(c), 364(d) AND 507(b); (D) MODIFYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362; AND (E) SCHEDULING A FINAL HEARING  PURSUANT TO BANKRUPTCY RULE 4001**

H.H. Holmes Testing Laboratories, Inc. ("HHH," "Company," or "Debtor"), the Debtor and Debtor-In-Possession in the above-captioned chapter 11 case ("Chapter 11 Case"), pursuant to §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d) and 507(b) of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), through its proposed counsel, respectfully requests that the Court enter an order authorizing HHH to use the cash collateral of CenTrust Bank, N.A. ("CenTrust" or "Bank") and to obtain post-petition financing from CenTrust pursuant to the terms and conditions more fully described below.  Because the continued and undisturbed business operations of HHH require the immediate use of cash collateral and the immediate extension of post-petition financing, HHH respectfully requests that the Court immediately enter an interim order substantially in the form attached hereto as Exhibit A ("Interim Order") authorizing the use of cash collateral and other financial accommodations

sought herein on an interim basis for a period through and including the date of the final hearing (as defined below).

## Jurisdiction

1.      On December 16, 2010 ("Petition Date"), the Debtor commenced the Chapter 11 Case by filing a voluntary petition under chapter 11 of the Bankruptcy Code.   The Debtor remains in possession of its property and continues to operate its business as a debtor-in-possession pursuant to §§1107 and 1108 of the Bankruptcy Code.

2.      On the Petition Date, Nelson Leasing ("NL"), an Illinois general partnership that is affiliated, by common ownership, with HHH filed a separate voluntary petition under Chapter 11 of the Bankruptcy Code.   The NL case has been designated Case Number 55501.   On November 17, 2010, this Court entered an order providing for the procedural consolidation of the two related cases.

3.      The Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.   Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.   This is a core proceeding under 28 U.S.C. § 157(b)(2).

4.      The statutory predicates for the relief that the Debtor seeks herein are §§ 105, 362, 364(c), 364(d), and 507(b) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 9014 and Local Rule 4001-2.

## Background

### *The Company*

5.      HHH is a closely-held corporation that has been in business continuously since 1936.   It has been owned by members of the Nelson family continuously since 1954.   HHH is based in Wheeling, Illinois, and has additional offices and testing facilities in Houston, Texas; Richardson, Texas; and Dallas, Texas.   It currently has approximately 50 full-time employees.

2

6.      HHH provides services to customers in a large number of industries, including large and small scale construction companies and commercial product packaging companies. Its services include construction materials testing, package testing, geotechnical engineering and geotechnical drilling. Its laboratory services involve research and testing with respect to a wide range of materials including soil, rock, concrete, aggregate, asphalt, masonry, steel, paper, corrugated cardboard, wood, metal, and plastic for retail, commercial, industrial and medical applications.

7.      HHH provides a wide array of packaging testing and consulting services for its customers, determining the reliability and practicality of packaging concepts. Its testing laboratory has an outstanding reputation in the industry and serves clients throughout the United States. Such analysis is accomplished through, among other things, vibration, handling, repetition, environmental exposure and compression testing. The Company also analyzes packaging materials and components, helps to develop testing protocols specific to the client's products, and provides standard as well as hazardous materials testing for medical and industrial applications.

8.      HHH offers the full range of geotechnical engineering and testing services to its clients. The Company offers in-house soil and rock testing facilities as well as subsurface exploration equipment and provides pressuremeter testing, structure analysis, and slope stability analysis through its professional staff of technicians, engineers, geologists and customer service professionals.

9.      HHH provides a broad spectrum of geotechnical drilling services. These services include: (a) contract/environmental drilling to investigate soil conditions to ensure a stable and lasting foundation, (b) analysis of soil and nearby water for contamination or other

3

environmental hazards; (c) preconstruction borings for subsurface investigations and engineering

reports, (d) recommendations for foundation types and depths, identification of conditions that

may not be suitable for intended structures, and recommendations regarding possible solutions to

soil or other problems; and (e) forensic drilling, coring and sampling with respect to previously

placed shotcrete, concrete or asphalt.

10.    HHH also offers advanced technology for portable laboratory facilities to meet its

client's quality assurance needs when removing samples to a fixed laboratory location is not

cost-effective or when a laboratory wholly dedicated to the client's project is required.  The

Company's "Lab-In-A-Box" mobile laboratories are built in 8' X 8' X 20'-40' cargo containers

and can be equipped to perform any combination of laboratory applications for soil, concrete and

asphalt testing.  The Company has provided on-site laboratories, staffed with qualified personnel,

to sites all over the world.

11.    In any given year, HHH serves between 450 and 675 customers.  Its customer list

includes such well-known and substantial companies, institutions, and governmental entities as

Dallas-Fort Worth International Airport, Pepper Construction Company, NorthShore University

Health System, Chesapeake Energy Corporation, and the City of Houston.  HHH is commonly

considered to be the "top brand" in its industry in its geographical markets.

### *The Company's Current Financial Problems*

12.    HHH experienced its revenue peak in 2006, when it achieved approximately

$7,500,000 in sales.  Since that time, however, sales volume has dipped precipitously due largely

to the economic recession.

13.    Because a substantial percentage of the Company's business is associated with the

construction industry, the business is seasonal.  Typically, both sales volume and corresponding

revenue drop greatly between mid-November and mid-April.  During the Summer of 2010, a

labor strike in the construction industry further eroded or delayed Company sales and revenue.

14.    In 2008, HHH attempted to offset the reduction in sales volume by acquiring

operations in the state of Texas.  To date, the Texas acquisition has only partially replaced the

lost sales volume.  Moreover, the Texas sales have, in general, produced a lower net contribution

margin due to additional management and infrastructure costs.  Hence, the additional Texas

sales, while helpful, have had a less than optimal impact on profitability.  In short, the additional

sales had the effect of heightening the Company's break-even level.

15.    In 2009, the Company generated total net sales of approximately $7,100,000, a

net loss of $821,000, and negative earnings before interest, taxes, depreciation, and amortization

("EBITDA") of $398,000.

16.     With only a few days remaining in 2010, the Company projects total net sales for

the year of approximately $7,100,000, and projects negative EBITDA of $273,000.

17.    The $125,000 improvement in EBITDA between 2009 and 2010 reflects cost-

saving measures that have been implemented by the Company.  During 2009 and 2010, the

Company implemented a number of cost-saving actions including, but not limited to, (a)

increasing employees' share of group health insurance premiums, (b) implementing across-the-

board salary reductions, (c) eliminating ten positions, and (d) decreasing discretionary spending.

When the annualized effect of these measures is fully realized, they should decrease the

Company's annual expenses by approximately $900,000.

18.    The Company's financial decline led to an unfortunate failure to remit

withholding taxes to federal and state revenue authorities between late 2009 and the first three

calendar quarters of 2010.  While the Company has resumed remitting such withholding taxes on

5

a current basis, its accrued liability for such taxes is approximately $1,500,000, exclusive of interest and asserted penalties. The Internal Revenue Service has recently served the Company with notice of the former's intent to levy upon the assets of the Company.

19.    The Company is currently a defendant in a small number of collection lawsuits and has, within the past several weeks, been the object of levies from the Texas Workforce Commission ($4,328.66) and Wisconsin Department of Revenue ($20,758.37).

20.    Recently, the Company engaged Neal L. Wolf and the law firm of Butler Rubin Saltarelli & Boyd LLP ("BRSB") to advise it regarding insolvency and debt restructuring matters. On the advice of its insolvency counsel, the Company engaged Steven Nerger and the business advisory firm of Silverman Consulting ("SC") to assist it in the development and implementation of short and long-term restructuring plans.

21.    With the assistance of its advisors, the Company is currently considering a number of additional potential cost reductions and revenue opportunities.

22.    In the opinion of the Company, SC, and BRSB, these and other cost-saving measures may well permit the Company to generate positive earnings before interest, taxes, depreciation, and amortization ("EBITDA") if sales do not further deteriorate. Unfortunately, however, absent substantial revenue growth, these cost-cutting measures will not by themselves produce sufficient EBITDA to permit the Company to amortize its tax liabilities and other accrued debt.

23.    With the assistance of its financial advisors, the Company has developed a still-preliminary financial plan under which all or substantially all of its assets, as well as the assets of NL, will be sold to a recently formed, minority-owned company, Holmes Consulting ("Consulting") that has qualified, or may shortly gain qualification, as a Disabled Business Entity

("DBE").  A company's qualification as a DBE entitles it to bid on certain governmental

contracts that may not, as a matter of applicable statutes or regulations, be given to non-DBE

entities.  The Company and Consulting together estimate that, based upon certain assumptions

which they believe to be conservative and achievable, the resulting DBE ("Newco") will

generate additonal sales of not less than $1,500,000 and significant additional EBITDA during

its first year of operation.  They estimate that Newco will be able to generate sufficient EBITDA

to amortize the debts owed to CenTrust, Bank of Kenosha, and the various taxing authorities

over a reasonable period of time.  While all of the details of this financial plan have yet to be

negotiated, the Company and Consulting believe that, with the co-operation and support of

CenTrust and the Bank of Kenosha, this financial plan can be realized.  If and when the details of

the financial plan have been negotiated and documented, those details will become the basis of a

Plan of Reorganization.

　　　　24.　　　For these reasons, the Company has elected to commence this voluntary Chapter

11 Case.  Chapter 11 will provide the Company with, among other things:  (a)  a stay of the

actual and threatened litigation that is currently draining precious liquidity from the Company;

(b) a stay of the imposition of threatened tax liens that would almost certainly deprive the

Company of any opportunity to obtain additional financing and reorganize; (c) the opportunity to

effectuate the contemplated sale of the Company to Consulting, with protections for the putative

purchaser from successor liability; (d) the potential use by the Company of the avoiding powers

and power to reject uneconomic executory contracts and unexpired leases; and (e) the right of the

Company to avail itself of the provisions of § 1129(a)(9)(C) in its treatment of its substantial tax

liabilities.

*The CenTrust Bank Loan Agreements*

25.     HHH currently owns no real estate. All of its real property assets are leased. The

Company's home office in Wheeling, Illinois is leased from NL.

26.     The Company's major source of financing and secured creditor is CenTrust.

CenTrust has been HHH's primary banker since 2006. As of November 30, 2010, the Company

owed CenTrust the aggregate amount of approximately $1,900,000 under both a term loan

("Term Loan") and a revolving credit facility ("Revolver").

27.     The Term Loan is memorialized by a "Promissory Note" in the principal amount

of $1,052,108.40, "Corporate Resolution to Borrow/Grant Collateral," "Business Loan

Agreement," "Commercial Security Agreement," and "Disbursement Request and

Authorization," all of which (together, the "Term Loan Documents") are dated as of November

13, 2009. A true and correct copy of the above-itemized Term Loan Documents is attached

hereto as Exhibit A. The Term Loan Documents call for 23 regular monthly payments of

principal in the amount of $18,000 plus interest commencing on December 13, 2009, and a final

irregular payment, on December 13, 2011, of $767,307 plus interest. The Term Loan bears

interest at the rate of 7% per annum. To secure the Term Loan, HHH granted the Bank a

security interest in all inventory, chattel paper, accounts, equipment, and general intangibles of

the Company.

28.     The Revolver is the latest in a series of similar revolving credit agreements

between HHH and CenTrust. The Revolver is memorialized by a "Promissory Note" in the

principal amount of $1,000,000, "Business Loan Agreement (Asset Based)," and "Commercial

Security Agreement," all of which (together, the "Revolver Documents," and together with the

Term Loan Documents, the "CenTrust Loan Agreement") all of which are dated as of September

30, 2010. A true and correct copy of the above-itemized Revolver Documents is attached hereto

8

as Exhibit B. Under the Revolver, the Company may make draws equal to 80% of eligible accounts receivable provided that the aggregate outstanding balance of the Revolver does not exceed $1,000,000. The Revolver bears interest at a floating rate equal to the Wall Street Journal Prime Rate plus 0.500%, with a floor of 5.75% per annum. The Prime Rate on the Petition Date was 3.25% per annum. To secure the Revolver, HHH granted the Bank a security interest in all inventory, chattel paper, accounts, equipment, and general intangibles of the Company. On the Petition Date, the principal balance of the Revolver was approximately $1,000,000.

29.     The Term Loan and the Revolver are cross-collateralized. Both the Term Loan and the Revolver are guaranteed by Scott R. Nelson and Todd R. Nelson, the shareholders of HHH.

30.     CenTrust has a duly-perfected security interest in most, but not all, of the personal property assets of the Company. Its duly-perfected security interest extends to, among other assets, the cash bank accounts of the Company. CenTrust's 's security interest in certain rolling stock has not been perfected for the reason that the CenTrust's  liens have not been noted on the Certificate of Title. A true and correct list of all items of rolling stock in which CenTrust  does not have a perfected security interest is attached hereto as Exhibit C.

31.     As noted above, the Company's business is seasonal. In past years, during the November to April period, the Company has often been compelled to ask CenTrust for out-of-formula "overadvances" to meet the Company's liquidity needs.  In the past, CenTrust has always agreed to make such overadvances.

32.     HHH has estimated that it will need an overadvance of $650,000 to meet its liquidity needs, including those liquidity needs which are related to the administration of the Chapter 11 Case, between the Petition Date and April 1, 2011.

**The Debtor-In-Possession Financing
Agreement Between HHH and CenTrust**

33.     CenTrust has consented to Debtor's use of cash collateral in the ordinary course

of business in accordance with the terms of the Budget (hereinafter defined), subject to the

adequate protection liens and payments discussed below and has agreed to assist HHH in

meeting its liquidity requirements between the Petition Date and April 1, 2011 by providing the

following post-petition financial accommodations to the Company (in the aggregate, together

with all terms and conditions thereof, the "DIP Financing Agreement"), as more specifically

provided in the separately executed DIP Financing Agreement, the terms of which shall be

approved in the Final Order:

(a)     Use of Cash Collateral.  The Company may use the cash collateral of CenTrust so
long as such use is, within certain defined and permitted "variances," in
accordance with the budgetary projections that are attached hereto as Exhibit D
("Budget").

(b)     Overadvances.  CenTrust  will honor draw requests for overadvances, provided
that [i] the aggregate amount of such overadvances, at any point in time, does not
exceed the sum of $650,000, [ii] the aggregate principal balance of the Revolver,
at any point in time, does not exceed the sum of $1,000,000, and [iii] such
advances are used in accordance with the Budget.

(c)     Adequate Protection.  As adequate protection for CenTrust , and in consideration
of CenTrust's  consent to the use of cash collateral and to the above-described
overadvances, CenTrust  shall have a duly-perfected security interest in all
property of the Company, whether such property is real or personal, or is now
owned or hereafter acquired and whether CenTrust had a pre-petition properly
perfected security interest in such property; ("DIP Collateral").  The CenTrust
security interest shall not, however, include the proceeds from  any causes of
action the Debtor may have under §§ 544, 545, 546, 547, 548, 549, 550, and 551
of the Bankruptcy Code.  The perfected security interest of CenTrust shall be
deemed perfected upon the date of entry of the Interim Order, whether or not any
other steps are taken or required to be taken to perfect such security interest under
applicable state law.  Notwithstanding the foregoing, HHH will cooperate with
CenTrust in taking all steps reasonably required by CenTrust in order to perfect
such security interest in accordance with applicable state law.

10

(d)    Carve Out. CenTrust's liens and security interests in the DIP Collateral and any
proceeds received by or due CenTrust from the DIP Collateral following an event
of default or disposition of DIP Collateral without any event of default shall be
subject to the prior payment of (a) the statutory fees payable to the U.S. Trustee
pursuant to 28 U.S.C. § 1930(a)(6) with respect to the Company (the "Statutory
Fees") and (b) the unpaid and outstanding reasonable fees and expenses actually
incurred on or after the Petition Date, with respect to services performed solely
with respect to the Debtor and approved by a final order of the Court pursuant to
§§ 326, 328, 330 or 331 of the Bankruptcy Code (collectively, the "Allowed
Professional Fees"), by attorneys, accountants and other professionals retained by
the Debtor, less the amount of any retainers, if any, then held by such persons, in
a cumulative, aggregate sum not to exceed in the case of all such Allowed
Professional Fees incurred either before or after the Carve Out Termination Date
(as defined below), the lesser of (I) the actual amount of such Allowed
Professional Fees incurred on or after the Petition Date, and (II) one hundred
twenty thousand dollars ($150,000.00) less the amount of all payments made by
or on behalf of the Company on account of such Allowed Professional Fees and
Statutory Fees through, and including the Carve Out Termination Date and the
amount of all payments made by or on behalf of the Borrowers on account of
Allowed Professional Fees and Statutory Fees after the Carve Out Termination
Date (hereafter, the "Professional Fee Carve Out" and, together with the Statutory
Fees, the "Carve Out"), provided that any such fees are approved by the
Bankruptcy Court. The term "Carve Out Termination Date" means the date on
which the Bank provides written notice to counsel for the Debtors, counsel for the
Creditors Committee (if appointed), and the U.S. Trustee that an Event of Default
has occurred and is continuing.

(e)    Interest Rate.  The interest rate applicable to the Term Loan and Revolver shall
be as provided in the existing Term Loan Documents and Revolver Documents.

(f)    Interest on Term Loan and Revolver. The Company will make no payments of
principal under the Term Loan and Revolver during the term of the DIP Financing
Agreement, but will continue to make required payments of interest under the
Term Loan and Revolver during that period.

(g)    Termination Date. The Termination Date of the DIP Facility shall be the date
which is the earliest of (a) the date that is 180 days after the Petition Date,
notwithstanding any appeal, stay, vacation or reconsideration regarding Debtor or
any proceeding or matter related to or regarding the Debtor or the Chapter 11
Case; (b) the effective date of a confirmed Plan of Reorganization; (c) the date
that is twenty-one (21) days after the entry of the Interim Order if the Final Order
has not been entered by the Court by such date and CenTrust has not agreed to, or
the Court has not ordered, an extension of such twenty-one day time period; (d)
the date of the closing of a sale of substantially all of the Company's assets
pursuant to § 363 of the Bankruptcy Code; (e) the date of conversion of the
Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code; (f) the date of
dismissal of the Chapter 11 Case; and (g) such earlier date on which all

obligations become due and payable under the terms of the CenTrust Loan Agreement.

(h)     Events of Default.  Events of Default include, among other things, the (a) Debtor's  failure to obtain entry of a Final Order which is not subject to any appeal, stay, vacation or reconsideration within twenty-one (21) days after the Petition Date unless such period is extended as provided above; (b) nonpayment of principal when due; (c) nonpayment of interest, fees or other amounts when due under the Term Loan and the Revolver; (d) inaccuracy or breach of representations and warranties arising from facts first occurring on or after the date of the commencement of the Bankruptcy Case (other than the commencement of the Bankruptcy Case); (e) violation of covenants (including covenants contained herein), arising from facts first occurring on or after the commencement of the Bankruptcy Case (other than the commencement of the Bankruptcy Case); (f) the entry of an order dismissing  the Bankruptcy Case or converting the case to a chapter 7 case, either voluntarily or involuntarily; (g) the entry of an order appointing a trustee in the Bankruptcy Case;  (h) the entry of an order granting any other super-priority claim or lien equal or superior in priority to that granted to the Bank; (i) failure by Debtor to comply with the Budget variance provisions set forth in paragraph 32(i); (j) failure by Debtor to remit all such federal and state withholding taxes after the Petition Date; (k) failure by Debtor to maintain and pay premiums for insurance to cover all of its assets from fire, theft and water damage; (l) the failure to comply with any provision of the Interim or Final DIP Orders; (m) the filing by Debtor of any motion, application or adversary proceeding challenging the validity, enforceability, perfection or priority of CenTrust's liens, whether prepetition and post-petition replacement and additional liens, (n) the intentional making of any material misrepresentation of a material fact after the Petition Date by Debtor or any of its agents about the financial condition of Debtor, the nature, extent, location, or quality of any pre or post-petition collateral, or the disposition or use of any pre or post-petition collateral, including cash collateral; and (p) the payment of any prepetition claims without CenTrust's consent

(i)     Budget.  Debtor shall meet and strictly comply, in all respects, with the Budget.  On a weekly basis for the period from the Petition Date through the last day of the Chapter 11 Case, (i) the aggregate actual disbursements by Debtor from the Petition Date to any report date shall be no greater than 110% of the aggregate amount of projected disbursements for such period as set forth in the Budget, and (ii) the aggregate amount of projected cash receipts collected by Debtor from the Petition date to any report date shall be no less than 90% of the aggregate amount of projected cash receipts for such period as set forth in the Budget.  Debtor shall provide CenTrust, so as to actually be received by 5 p.m. (CST) of each Thursday of each calendar week, weekly line-by-line variance reports (in form and scope reasonably acceptable to CenTrust) for the immediately preceding weekly period and on a cumulative basis from the Petition Date to the report date, comparing actual cash receipts and actual cash disbursements to cash receipts and cash disbursements forecasted in the Budget for such period and showing on a line-by-

line basis any variance to the corresponding line-item of the Budget together with an explanation for such variance. Debtor shall not make any payments or other disbursements other than the itemized projected disbursements set forth in the Budget without the prior written consent of CenTrust and/or order of the Bankruptcy Court. Failure by Debtor to comply with the Budget variance provisions described herein shall constitute an Event of Default under the DIP Financing Agreement and the DIP Orders. The Budget shall not be modified without the prior written consent of CenTrust and/or order of the Bankruptcy Court.

(j)    Fee. Debtor shall pay a fee in the amount of Fifty Thousand Dollars ($50,000.00) which fee shall be deemed earned by CenTrust as of the date hereto and shall be paid on the date of confirmation of Debtor's plan of reorganization. In addition, an exit fee of two percent (2%) of the aggregate outstanding indebtedness of the Term Loan and Revolver shall be paid by and at the time of the purchase of Debtor's assets.

(k)    Remedies Upon Default. Upon the occurrence of an Event of Default, subject to such order or orders as may be entered by the Bankruptcy Court upon application of the Debtor or any other party in interest, CenTrust shall have all customary remedies available, including, without limitation, the right to immediately terminate the DIP Financing Agreement, to immediately cease providing financing to Debtor  and the right to realize on any or all collateral without the necessity of obtaining any further relief or order from the Bankruptcy Court. Upon the occurrence of an Event of Default, Debtor shall be immediately prohibited from use of CenTrust's cash collateral.

## The DIP Facility Should Be Authorized

34.    Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit outside of the ordinary course of business, (c) obtaining credit with specialized priority or with security, and (d) obtaining credit with equal priority or priming liens. If a debtor in possession cannot obtain post-petition credit on an unsecured basis, courts may authorize the obtaining of credit or the incurring of debt, repayment of which is entitled to superpriority administrative expense status or is secured by a lien on unencumbered property or a junior lien on encumbered property, or a combination of the foregoing. See 11 U.S.C. § 364.

35.     In addition to authorizing financing under § 364(c) of the Bankruptcy Code,

courts also may authorize post-petition credit secured by a senior or equal lien on encumbered

property without consent from affected secured parties if the debtor cannot obtain credit

elsewhere and the interests of existing lienholders are adequately protected. See 11 U.S.C. §

364(d)(1).

36.     Section 364 of the Bankruptcy Code, provides in pertinent part, that:

> (c)     If the trustee is unable to obtain unsecured credit allowable under
> §503(b)(1) of this title as an administrative expense, the court, after notice and a
> hearing, may authorize the obtaining of credit or the incurring of debt
>
> > (1)     with priority over any or all administrative expenses of the kind
> > specified in § 503(b) or 507(b) of this title;
> >
> > (2)     secured by a lien on property of the estates that is not otherwise
> > subject to a lien; or
> >
> > (3)     secured by a junior lien on property of the estate that is subject to a
> > lien.
>
> (d)     The Court, after notice and a hearing may authorize the obtaining of credit
> or the incurring of debt secured by a senior or equal lien on property of the estate
> that is subject to a lien if –
>
> > (A)     the trustee is unable to obtain such credit otherwise; and
> >
> > (B)     there is adequate protection of the interest of the holder of the lien
> > on the property of the estate on which such senior or equal lien is
> > proposed to be granted.

11 U.S.C. § 364.

37.     Generally, §§ 364(c) and (d) of the Bankruptcy Code require a debtor to

demonstrate, before the granting of such protection, that alternate sources of credit are not

available under §§ 364(a) or (b) of the Bankruptcy Code. In order to gain approval for post-

petition financing on a secured basis, a debtor must demonstrate that it could not obtain credit on

unsecured basis, that the credit transactions are necessary to preserve the assets of the debtor's

14

estate and that the terms of the underlying credit agreements are fair, reasonable and adequate.

See *In re Ames Den't Stores, Inc.*, 115 B.R. 34, 37, 40-41 (Bankr. S.D.N.Y 1990).

38.     In light of Debtor's financial condition and existing financial arrangements, the

universe of lenders who could commit to meet the Debtor's post-petition financing requirements

is extremely limited.

39.     The Debtor has determined, in consultation with its advisors, that it would not be

able to obtain unsecured credit or other financial accommodations allowable as administrative

expense under § 503(b)(1) of the Bankruptcy Code and that debtor-in-possession financing is not

otherwise available without Debtor (i) granting CenTrust, pursuant to §364(c)(1) of the

Bankruptcy Code, claims having priority over any and all administrative expenses of the kinds

specified in §§ 503(b) and 507(b) of the Bankruptcy Code and (ii) securing, pursuant to §§

364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, such obligations in the DIP Collateral.

40.     It would be unrealistic and unnecessary to require the Debtor to conduct an

exhaustive search for other or better financing, particularly in light of the reasonableness of the

terms offered to the Debtor by its existing lender, CenTrust. *In re Sky Valley, Inc.*, 100 B.R. 107,

113 (Bankr. N.D. Ga. 1988), *aff'd sub nom, Anchor Savings Bank FSB. v. Sky Valley, Inc.*, 99

B.R. 117, 120 n.4 (N.D. Ga. 1989).

41.     As with other business decisions, in considering whether to approve a debtor's

request to obtain post-petition financing, the courts typically defer to the debtor's business

judgment and its determination that the financing is in the best interests of the estate. See, e.g.,

*Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943); *In*

*re Simasko Prod. Co.*, 47 B.R. 444, 448-49 (D. Colo. 1985) (authorizing interim financing

agreement where debtor's business judgment indicated financing was necessary and reasonable

15

for benefit of estates and noting that "[b]usiness judgments should be left to the board room and

not to this Court."); *In re Ames Dep't Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with

respect to post-petition credit, courts "permit debtors-in-possession to exercise their basic

business judgment consistent with their fiduciary duties."); see also 3 *Collier on Bankruptcy*

364.03, at 364-7-18 (15th ed. rev. 2008).

42.    The Debtor has negotiated the best financing arrangement it could reasonably

expect under the circumstances. The terms of the proposed agreement with CenTrust are fair and

reasonable under all of the circumstances.  The Debtor has exercised sound business judgment in

determining that the financing pursuant to the DIP Facility is appropriate. In order for the Debtor

to achieve the necessary liquidity to administer the Chapter 11 Case and accomplish an orderly

sale of its assets , Debtor must have access to working capital.

43.    The DIP Facility fees and the Interest Rate are customary and reasonable. The

alternatives to the DIP Facility are dire; without the liquidity that is provided by the proposed

financing, the Debtor cannot continue its operations and will be compelled to convert the case to

a chapter 7 case.  Accordingly,  the Debtor should be granted authority to enter into the DIP

Facility, to borrow funds from CenTrust pursuant to the terms described above, and to take the

other actions contemplated by the DIP Facility and requested herein.

44.    In addition to authorizing financing under §§ 364(c)(2) and 364(c)(3), courts also

may authorize post-petition credit to be secured by a senior or equal lien on encumbered property

without consent from affected secured parties if the debtor cannot obtain credit elsewhere and the

interests of existing lienholders are adequately protected. See 11 U.S.C. § 364(d)(1).

### The Lenders Are Entitled to "Good Faith" Protections of § 364(e)

45.    The terms and conditions of the DIP Facility are fair and reasonable.  Its terms

and conditions were negotiated in good faith and at arm's length at all times by the Debtor, its

16

agents, CenTrust, and the latter's respective advisors. The DIP Financing Agreement went

through several iterations and reflect material changes from the terms originally proposed.

Debtors and CenTrust also conducted negotiations concerning the Budget and the terms of

certain "first-day" pleadings that require the immediate access to interim financing from

CenTrust. In light of the foregoing, CenTrust should be accorded the benefits and protections of

§ 364(e) of the Bankruptcy Code with respect to the DIP Facility; specifically, any loans,

advances or other financial accommodations that the CenTrust makes or cause to be made from

time to time to the DIP Borrowers on the terms and conditions set forth in the DIP Financing

Agreement should be deemed to have been made and provided in "good faith," as the term is

used in § 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of § 364(e)

of the Bankruptcy Code in the event that the DIP Orders or the DIP Financing Documents or any

provisions are hereafter modified, vacated, amended or stayed by subsequent order of the Court

or any other court without the express consent of CenTrust.

### Modification of the Automatic Stay is Warranted.

46.     Paragraph 3.4 of the proposed Interim Order provides that the automatic  stay

provisions of § 362 of the Bankruptcy Code are vacated and modified to the extent necessary to,

*inter alia*, permit CenTrust  to perform any acts necessary to implement the DIP Financing

Agreement. In addition, the proposed Interim Order provides that the automatic stay provisions

of § 362 of the Bankruptcy Code are vacated and modified to the extent necessary to exercise,

upon the occurrence and during the continuation of any Event of Default, all rights and remedies

provided for in the DIP Financing Agreement, and to take various actions without further order

of or application to the Court. However, CenTrust must provide the Debtor and various other

parties, including the United States Trustee, with three (3) business days written notice prior to

exercising any enforcement rights or remedies in respect of the DIP Collateral.

17

47.     Stay modification provisions of this sort are ordinary and usual features of debtor in possession financing facilities and, in the Debtor's business judgment, are reasonable under the present circumstances. Accordingly, the Court should modify the automatic stay to the extent contemplated by the DIP Financing Agreement and the proposed DIP Order.

### Request for interim and Final Orders and Final Hearing and Notice Procedures

48.     Pursuant to Local Rule 4001-2(c), the Final Order may only be entered after notice and a hearing and ordinarily the Debtor may not schedule a hearing to consider the Final Order until at least ten (10) days after the organizational meeting of the creditors' committee. While no such organizational meeting has been scheduled, given the exigencies of the circumstances and the interconnectedness of the relief sought in this Motion, the Debtor respectfully requests that the Court schedule the Final Hearing to occur twenty (20) days from the Petition Date, or as soon thereafter as Debtor may be heard.

49.     Debtor shall, within three (3) business days of the entry of the Interim Order by the Court, serve by overnight mail a copy of the Interim Order and the notice of the Final Hearing to consider entry of the Final Order on the date established by the Court. Any party in interest objecting to the relief sought at the Final Hearing shall serve and file objections, which objections shall: (i) be in writing; (ii) conform to the Bankruptcy Rules and Local Rules; and (iii) be filed with the Clerk of the Bankruptcy Court for the Northern District of Illinios  and served upon the following parties so as to be received not less than three (3) days before the Final Hearing:

### Basis for Emergency Relief

50.     Debtor bring this Motion on an expedited basis to avoid the immediate and irreparable harm that will be suffered by the estate if  Debtor does not immediately obtain the liquidity needed to continue its business operations.

51.     Local Rule 4001(b) provides that the Court may grant interim relief when it is necessary to avoid immediate and irreparable harm to the estate. Bankruptcy Rules 4001(b) and (c) permit a court to approve a debtor's request to obtain post-petition financing during the period following the filing of a motion requesting such relief "to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bank. P. 4001(b)(2) and (c)(2). Those rules also provide that a final hearing on a motion to obtain financing pursuant to § 364 of the Bankruptcy Code may not be commenced earlier than fifteen (15) days after service of such motion. Id.

52.     Upon request, however, a court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of financing to the extent necessary to avoid immediate and irreparable harm to a debtor's estate. In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions, and a debtor should be entitled to borrow those amounts that it believes prudent in the operation of its business. See, e.g., Simasko, 47 B.R. at 449; see also Arnes Dep't Stores, 115 B.R. at 36, 38.

53.     Pending the Final Hearing, the Debtor requires immediate financing. Without immediate access to financing, the Debtor will be unable to pay critical obligations or other costs associated with its continued operation as a going concern. It is imperative that the Debtor have immediate use of interim borrowing to pay its operating costs, and funds are urgently needed to meet all of the Debtor's liquidity needs and to administer the Chapter 11 Case in an orderly manner. In the absence of immediate post-petition financing, Debtor's ability to preserve the value of their business and assets will be immediately and irreparably jeopardized, resulting in significant harm to the estate and creditors.

54.      Thus, Debtor requests that the Court (i) conduct an expedited hearing on the

Motion, (ii) grant the Interim Order, (iii) schedule a Final Hearing, and (iv) establish notice and

objection procedures in respect thereof, as proposed herein, in accordance with Bankruptcy Rule

4001(b) and (c).

<u>Notice</u>

55.      Debtor shall have serviced notice of this Motion in accordance with Rule 4001(c)

on (i) CenTrust, (ii) the United States Trustee for the Northern District of Illinois, (iii) the

holders of the twenty (20) largest unsecured claims against the Debtor's estate, (iv) all vendors

who have shipped goods to the Debtor within 45 days of the Petition Date; (v) all parties known

to Debtor who hold any liens or security interest in the Debtor's assets who have filed UCC-1

financing statements against the Debtor, or who, to Debtor's knowledge, have asserted any liens

on any of the Debtor's assets; (vi) all landlords of Debtor;; (vii) the Internal Revenue Service and

all taxing authorities of states in which Debtor is doing business; ; and (viii) certain other parties

identified in the certificates of service filed with the Court. As this Motion is seeking first-day

relief, notice of this Motion and any order entered hereon will be served on all parties required

by Local Rule 9013-1(m).

<u>No Prior Application</u>

56.      No prior application for the relief requested herein has been made to this Court or

any other court.

<u>Conclusion</u>

WHEREFORE, Debtor respectfully requests that the Court (i) enter an order substantially

in the form of the proposed Interim Order annexed hereto as Exhibit A, (ii) schedule the Final

Hearing, (iii) after the Final Hearing, enter a Final Order substantially in the form of the Interim

Order and as filed with the Court prior to the Final Hearing, and (iv) grant such other and further

relief as is just and proper.

Dated:   December 20, 2010
Chicago, Illinois

<div style="margin-left:45%">

Neal L. Wolf (ARDC No. 6186961)
Cheryl Tama Oblander (ARDC No. 6199464)
BUTLER RUBIN SALTARELLI & BOYD LLP
70 West Madison Street
Suite 1800
Chicago, Illinois 60602
(312) 444-9660

*Counsel for Debtor and Debtor-in-Possession*

</div>

470813v1

21