IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re: | ) |
| | ) **Chapter 11** |
| **H.H. Holmes Testing Laboratories,** | ) **Case No. 10-55500** |
| **Inc., et al.,** | ) (Jointly Administered) |
| | ) |
| Debtors. | ) Judge Susan Pierson Sonderby |
| | ) |

**FINAL ORDER (A) AUTHORIZING THE DEBTOR TO USE
CASH COLLATERAL, (B) AUTHORIZING THE DEBTOR TO OBTAIN
POST-PETITION FINANCING, AND (C) GRANTING SECURITY INTERESTS
AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS
PURSUANT 11 U.S.C. §§ 105(a), 364(c), 364(d) AND 507(b)**

This Court having considered the Motion of the Debtor, H.H. Holmes Testing Laboratories, Inc. ("HHH," "Company," or "Debtor") for an Order, among other things, authorizing the Debtor to use cash collateral of CenTrust Bank, N.A., and authorizing the Debtor to obtain post-petition financing from CenTrust ("Motion") [Doc. No. 13-1], and the Court having determined that, in light of all of the facts and circumstances set forth therein, and the Debtor's need for the use of cash collateral and the post-petition financing provided for in the Motion in order to continue its business operations on an uninterrupted basis, the Court finds that CenTrust has consented to Debtor's use of cash collateral in the ordinary course of business in accordance with the terms of the Budget defined below (capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion), subject to the adequate protection, liens and priority status described more fully below and has agreed to assist HHH in meeting its liquidity requirements between the Petition Date and April 1, 2011 by providing the following described post-petition financial accommodations to the Company (in the aggregate,

together with all terms and conditions thereof, the "DIP Financing Agreement"), and it appearing to the Court that CenTrust has acted in good faith in extending these financial accommodations to the Debtor; and,

WHEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

(1) The use of cash collateral and post-petition borrowing is authorized as provided for in said Motion, upon the terms and conditions more fully described immediately below:

(a) Use of Cash Collateral. The Company may use the cash collateral of CenTrust so long as such use is, within certain defined and permitted "variances," as provided herein and in accordance with the budgetary projections that are attached hereto as <u>Exhibit A</u> ("Budget").

(b) Overadvances. CenTrust will honor draw requests for overadvances, provided that [i] the aggregate amount of such overadvances, at any point in time, does not exceed the sum of $650,000.00, [ii] the aggregate principal balance of the Revolver, at any point in time, does not exceed the sum of $1,000,000.00, and [iii] such advances are used in accordance with the Budget.

(c) Adequate Protection. As adequate protection for CenTrust, and in consideration of CenTrust's consent to the use of cash collateral and to the above-described overadvances, CenTrust shall have a duly-perfected security interest in all property of the Company, whether such property is real or personal, or is now owned or hereafter acquired and whether CenTrust had a pre-petition properly perfected security interest in such property; ("DIP Collateral"); provided, however, that any committee of unsecured creditors appointed by the U.S. Trustee shall have through 11:58 p.m. Central time on February 24, 2011, to file any objection to any extension or perfection of an interest in or upon any rolling stock of Debtor pursuant to this Final Order. The CenTrust security interest shall not, however, include the proceeds from any causes of action the Debtor may have under §§ 544, 545, 546, 547, 548, 549, 550, and 551 of the Bankruptcy Code. The perfected security interest of CenTrust shall be deemed perfected upon the date of entry of the Interim Order [Doc. No. 27], whether or not any other steps are taken or required to be taken to perfect such security interest under applicable state law. Notwithstanding the foregoing, HHH will cooperate with CenTrust in taking all steps reasonably required by CenTrust in order to perfect such security interest in accordance with applicable state law and therefore, HHH is hereby authorized, without further order of Court, to execute such other necessary and ancillary documents related thereto.

(d) Carve Out. CenTrust's liens and security interests in the DIP Collateral and any proceeds received by or due CenTrust from the DIP Collateral following an event of default or disposition of DIP Collateral without any event of default shall be subject to the prior payment of (a) the statutory fees payable to the U.S.

Trustee pursuant to 28 U.S.C. § 1930(a)(6) with respect to the Company (the "Statutory Fees") and (b) the unpaid and outstanding reasonable fees and expenses actually incurred on or after the Petition Date, with respect to services performed solely with respect to the Debtor and approved by a final order of the Court pursuant to §§ 326, 328, 330 or 331 of the Bankruptcy Code (collectively, the "Allowed Professional Fees"), by attorneys, accountants and other professionals retained by the Debtor, less the amount of any retainers, if any, then held by such persons, in a cumulative, aggregate sum not to exceed in the case of all such Allowed Professional Fees incurred either before or after the Carve Out Termination Date (as defined below), the lesser of (I) the actual amount of such Allowed Professional Fees incurred on or after the Petition Date, and (II) one hundred twenty thousand dollars ($120,000.00) less the amount of all payments made by or on behalf of the Company on account of such Allowed Professional Fees and Statutory Fees through, and including the Carve Out Termination Date and the amount of all payments made by or on behalf of the Borrowers on account of Allowed Professional Fees and Statutory Fees after the Carve Out Termination Date (hereafter, the "Professional Fee Carve Out" and, together with the Statutory Fees, the "Carve Out"), provided that any such fees are approved by the Bankruptcy Court. The term "Carve Out Termination Date" means the date on which the Bank provides written notice to counsel for the Debtors, counsel for the Creditors Committee (if appointed), and the U.S. Trustee that an Event of Default has occurred and is continuing.

(e)    Interest Rate. The interest rate applicable to the Term Loan and Revolver shall be as provided in the existing Term Loan Documents and Revolver Documents.

(f)    Interest on Term Loan and Revolver. The Company will make no payments of principal under the Term Loan and Revolver during the term of the DIP Financing Agreement, but will continue to make required payments of interest under the Term Loan and Revolver during that period.

(g)    Termination Date. The Termination Date of the DIP Facility shall be the date which is the earliest of (a) the date that is 180 days after the Petition Date, notwithstanding any appeal, stay, vacation or reconsideration regarding Debtor or any proceeding or matter related to or regarding the Debtor or the Chapter 11 Case; (b) the effective date of a confirmed Plan of Reorganization; (c) the date of the closing of a sale of substantially all of the Company's assets pursuant to § 363 of the Bankruptcy Code; (d) the date of conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code; (e) the date of dismissal of the Chapter 11 Case; and (f) such earlier date on which all obligations become due and payable under the terms of the CenTrust Loan Agreement.

(h)    Events of Default. Events of Default shall constitute: (a) nonpayment of principal when due; (b) nonpayment of interest, fees or other amounts when due under the Term Loan and the Revolver; (c) inaccuracy or breach of representations and warranties arising from facts first occurring on or after the

date of the commencement of the Bankruptcy Case (other than the commencement of the Bankruptcy Case); (d) violation of covenants (including covenants contained herein), arising from facts first occurring on or after the commencement of the Bankruptcy Case (other than the commencement of the Bankruptcy Case); (e) the entry of an order dismissing the Bankruptcy Case or converting the case to a chapter 7 case, either voluntarily or involuntarily; (f) the entry of an order appointing a trustee in the Bankruptcy Case; (g) the entry of an order granting any other super-priority claim or lien equal or superior in priority to that granted to the Bank; (h) failure by Debtor to comply with the Budget variance provisions set forth in paragraph 32(i) of the Motion; (i) failure by Debtor to remit all such federal and state withholding taxes after the Petition Date; (j) failure by Debtor to maintain and pay premiums for insurance to cover all of its assets from fire, theft and water damage; (k) the failure to comply with any provision of the Interim or Final DIP Orders; (l) the filing by Debtor of any motion, application or adversary proceeding challenging the validity, enforceability, perfection or priority of CenTrust's liens, whether prepetition and post-petition replacement and additional liens; (m) the intentional making of any material misrepresentation of a material fact after the Petition Date by Debtor or any of its agents about the financial condition of Debtor, the nature, extent, location, or quality of any pre or post-petition collateral, or the disposition or use of any pre or post-petition collateral, including cash collateral; and (n) the payment of any prepetition claims without CenTrust's consent.

(i)     Budget. Debtor shall meet and strictly comply, in all respects, with the Budget. On a weekly basis for the period from the Petition Date through the last day of the Chapter 11 Case, (i) the aggregate actual disbursements by Debtor from the Petition Date to any report date shall be no greater than 110% of the aggregate amount of projected disbursements for such period as set forth in the Budget, and (ii) the aggregate amount of projected cash receipts collected by Debtor from the Petition date to any report date shall be no less than 90% of the aggregate amount of projected cash receipts for such period as set forth in the Budget. Debtor shall provide CenTrust, so as to actually be received by 5 p.m. (CST) of each Thursday of each calendar week, weekly line-by-line variance reports (in form and scope reasonably acceptable to CenTrust) for the immediately preceding weekly period and on a cumulative basis from the Petition Date to the report date, comparing actual cash receipts and actual cash disbursements to cash receipts and cash disbursements forecasted in the Budget for such period and showing on a line-by-line basis any variance to the corresponding line-item of the Budget together with an explanation for such variance. Debtor shall not make any payments or other disbursements other than the itemized projected disbursements set forth in the Budget without the prior written consent of CenTrust and/or order of the Bankruptcy Court. Failure by Debtor to comply with the Budget variance provisions described herein shall constitute an Event of Default under the DIP Financing Agreement and the DIP Orders. The Budget shall not be modified without the prior written consent of CenTrust and/or order of the Bankruptcy Court.

(j) Fee. Debtor shall pay a fee in the amount of Fifty Thousand Dollars ($50,000.00) which fee shall be deemed earned by CenTrust as of the date hereto and shall be paid on the date of confirmation of Debtor's plan of reorganization. In addition, an exit fee of two percent (2%) of the aggregate outstanding indebtedness of the Term Loan and Revolver shall be paid by and at the time of the purchase of Debtor's assets.

(k) Remedies Upon Default. Upon the occurrence of an Event of Default, after providing the Debtor with seven (7) days notice and opportunity to cure, and subject to such order or orders as may be entered by the Bankruptcy Court upon application of the Debtor or any other party in interest, CenTrust shall have all customary remedies available, including, without limitation, the right to immediately terminate the DIP Financing Agreement, to immediately cease providing financing to Debtor and the right to realize on any or all collateral without the necessity of obtaining any further relief or order from the Bankruptcy Court. Upon the occurrence of an Event of Default, Debtor shall be immediately prohibited from use of CenTrust's cash collateral.

Done in open court this 19 day of January, 2011.

_____
Honorable Susan Pierson Sonderby
Bankruptcy Judge

472060v3

5

# EXHIBIT A
# BUDGET

# HH Holmes
## Detailed Weekly Cash Flow

| | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | Cumulative |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | 2 days 12/17/10 Forecast | 1 week 12/24/10 Forecast | 1 week 12/31/10 Forecast | 1 week 01/07/11 Forecast | 1 week 01/14/11 Forecast | 1 week 01/21/11 Forecast | 1 week 01/28/11 Forecast | 1 week 02/04/11 Forecast | 1 week 02/11/11 Forecast | 1 week 02/18/11 Forecast | 1 week 02/25/11 Forecast | 1 week 03/04/11 Forecast | Dec 17-Mar 4 Forecast |

### CASH FLOW
### NET SALES
### RECEIPTS

| | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | Cum |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 WHEELING | 20,000 | 40,000 | 90,000 | 121,117 | 60,568 | 121,117 | 35,134 | 126,550 | 50,566 | 101,116 | 29,332 | 102,903 | 991,403 |
| 3 RICHARDSON | 5,000 | 5,000 | 47,682 | 18,750 | 6,658 | | 13,334 | 16,134 | 6,668 | 13,334 | 3,868 | 8,000 | 322,682 98,328 |
| 5 HOUSTON-WASTERN | | | 4,328 | 6,000 | 10,000 | | 3,868 | | | | | 16,124 | 108,342 |
| HOUSTON-WASTERN | | 0 | 0 | | | | | 50,000 | | | 0 | 60,000 | 120,000 |
| 4 HOUSTON | 5,000 | 5,000 | 5,000 | 10,001 | 5,001 | 10,001 | 2,901 | | 5,835 | 11,667 | 3,385 | 16,451 | 94,007 |
| 6 DFW | 2,339 | 0 | 0 | 6,000 | | | 10,000 | 13,767 | 6,000 | 7,500 | | 30,000 | 50,000 48,000 |
| NELSON - CELL PHONE TOWERS | | | 1,661 | | | 10,000 | | | 25,000 | | | 30,000 | 80,339 |
| OTHER | | | 2,150 | 2,150 | | 2,150 | 2,150 | | | 2,150 | 2,150 | | 80,000 12,900 |
| Credits | | | 20,000 | | | | | | | | | | |
| NET SALES | 27,339 | 47,339 | 73,671 | 30,750 | 51,250 | 51,250 | 51,250 | 141,250 | 47,250 | 48,750 | 38,735 | 142,500 | 761,349 |

NET COLLECTIONS: 50,000 | 123,000 | 102,150 | 146,602 | 95,237 | 146,602 | 94,053 | 156,451 | 88,068 | 128,267 | 135,488 | 1,304,653

### DISBURSEMENTS
### Operating Expenses

| | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | Cum |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GROSS PAYROLL & TAXES | 64,552 | 61,603 | 59,119 | 47,174 | 39,462 | 39,462 | 39,462 | 39,462 | 39,462 | 39,679 | 40,250 | 41,980 | 551,670 |
| EXPENSES THRU PAYROLL - ALL | 9,194 | 7,000 | 4,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 43,194 |
| MILEAGE - ALL | | | | | | | | | | | | 0 | 0 |
| PAYROLL & EXP | 73,746 | 68,603 | 63,619 | 49,674 | 41,962 | 41,962 | 41,962 | 41,962 | 41,962 | 42,179 | 42,750 | 44,480 | 594,865 |
| HEALTH INSURANCE | | 7,000 | | 7,000 | | | 7,000 | 7,000 | | | | 7,000 | 21,000 |
| HEALTH-NON-BARGAINING | | | | | | | | | | | | 7,000 | 7,000 |
| UNION DUES | | 68,000 | | | | 46,561 | | | | | | 20,563 | 135,124 |
| PROF. SERVICES - (SUBCONTRACTORS) | | 3,817 | | 3,817 | 3,817 | 3,817 | 3,817 | 3,667 | 3,667 | 3,667 | 3,667 | 3,667 | 41,238 |
| TX ALS & BEST SUBS | 60,000 | | | | | 60,000 | | | | 30,000 | | | 150,000 |
| TX OTHER SUBS - AP PAYDOWN | | | | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | | | | 10,000 | 22,500 |
| SUPPLIES | 162 | 162 | 162 | 162 | 162 | 162 | 162 | 162 | 162 | 162 | 162 | 162 | 1,778 |
| ACCREADITATIONS | | | | | 4,331 | | | | | | | | 2,000 |
| AUTO LEASING | | 4,331 | | | | | | | | | 4,331 | | 12,993 |
| EQUIPMENT LEASING | 0 | 575 | 575 | 575 | 575 | 575 | 575 | 575 | 575 | 575 | 575 | 575 | 6,326 |
| INSURANCE | 0 | 0 | 0 | 0 | 0 | 3,200 | 0 | 38,200 | 0 | 0 | 0 | 0 | 41,400 |
| UTILITIES | 1,696 | 1,686 | 1,686 | 1,686 | 1,686 | 1,686 | 1,686 | 1,686 | 1,686 | 1,686 | 1,686 | 1,686 | 18,544 |
| RENT | | | | 19,350 | | | | 19,350 | | | | 19,350 | 58,050 |
| OFFICE EXPENSE | | 5,000 | 5,000 | 3,124 | 3,124 | 3,124 | 3,124 | 3,124 | 3,124 | 3,124 | 3,124 | 3,124 | 38,120 |
| ALARM AND SECURITY | | | | 108 | 108 | 108 | 108 | 108 | 108 | 108 | 108 | 108 | 968 |
| TELEPHONE & MOBILE | | | | 1,751 | 1,751 | 1,751 | 1,751 | 1,751 | 1,751 | 1,751 | 1,751 | 1,751 | 15,755 |
| COMPUTER GENERAL | | | | 2,003 | 2,003 | 2,003 | 2,003 | 2,003 | 2,003 | 2,003 | 2,003 | 2,003 | 18,031 |
| TRAVEL EXPENSE | | | | 535 | 535 | 535 | 535 | 535 | 535 | 535 | 535 | 535 | 4,814 |
| SALES EXPENSE | | | | 70 | 70 | 70 | 70 | 70 | 70 | 70 | 70 | 70 | 628 |
| LEGAL EXPENSE | | | | 698 | 698 | 698 | 698 | 698 | 698 | 698 | 698 | 698 | 6,279 |
| ACCOUNTING EXPENSE | | | | 930 | 930 | 930 | 930 | 930 | 930 | 930 | 930 | 930 | 8,372 |
| LICENSE AND PERMITS | | | | 526 | 526 | 526 | 526 | 526 | 526 | 526 | 526 | 526 | 4,733 |
| AUTO EXPENSE (REPAIRS) | | | | 1,336 | 1,336 | 1,336 | 1,336 | 1,336 | 1,336 | 1,336 | 1,336 | 1,336 | 12,026 |
| REPAIRS EQUIP & GENERAL | | | | 448 | 448 | 448 | 448 | 448 | 448 | 448 | 448 | 448 | 4,032 |
| BANK & CC FEES | | | | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 209 |
| MISCELLANEOUS EXPENSE | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| AMORTIZATION | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DEPRECIATION | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Operating Expenses | 60,000 | 90,571 | 11,240 | 46,642 | 20,292 | 134,384 | 27,292 | 46,492 | 55,842 | 47,642 | 23,973 | 81,555 | 645,921 |

### Other (Income)/ Expenses

| | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | Cum |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| INTEREST TERM & REVOLVER | | | 4,790 | | 5,431 | | | 4,790 | | 5,431 | | 4,790 | 25,231 |
| PRINCIPAL CENTRUST TERM | | 0 | 0 | | 0 | | | 0 | | | | | 0 |
| PRINCIPAL GMAC | | 6,500 | | | 6,500 | | | 6,500 | | | | | 19,500 |
| PRINCIPAL OTHER AUTOS | | 1,700 | | | 1,700 | | | 1,700 | | | | | 5,100 |
| P&I Debt Payments | - | 8,200 | 4,790 | - | 13,631 | - | - | 8,200 | - | 5,431 | - | 4,790 | 49,831 |

# HH Holmes
## Detailed Weekly Cash Flow

| Date | 2 days 12/17/10 Forecast | 1 week 12/24/10 Forecast | 1 week 12/31/10 Forecast | 1 week 01/07/11 Forecast | 1 week 01/14/11 Forecast | 1 week 01/21/11 Forecast | 1 week 01/28/11 Forecast | 1 week 02/04/11 Forecast | 1 week 02/11/11 Forecast | 1 week 02/18/11 Forecast | 1 week 02/25/11 Forecast | 1 week 03/04/11 Forecast | Cumulative Dec 17-Mar 4 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Budget/Actual | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | |
| **Other Cash Disbursements** | | | | | | | | | | | | | |
| AP WH - PAYDOWN | | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | | | | | 11,000 |
| RECONCILING ITEMS | | | | | | | | | | | | | - |
| OTHER | | | | | | | | | | | | | - |
| OTHER | | | | | | | | | | | | | - |
| OTHER | | | | | | | | | | | | | - |
| RESTRUCTURING & NON-RECURRING | 3,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 5,000 | 5,000 | 103,000 |
| Other Cash Disbursements | 3,000 | 11,000 | 11,000 | 11,000 | 11,000 | 11,000 | 11,000 | 11,000 | 10,000 | 10,000 | 5,000 | 9,000 | 114,000 |
| **DISBURSEMENTS** | 136,746 | 178,374 | 90,649 | 107,316 | 86,885 | 187,346 | 80,254 | 104,244 | 116,004 | 105,252 | 71,723 | 139,824 | 1,404,617 |
| **NET CF (Weekly)** | (86,746) | (55,374) | 11,501 | 39,286 | 8,352 | (40,744) | 13,799 | 52,207 | 42,281 | 23,016 | (32,988) | (4,335) | (99,964) |
| Beginning Cash (net of O/S) | 100,000 | 13,254 | (42,120) | (30,619) | 8,667 | 17,019 | (23,726) | (9,926) | 42,281 | 14,345 | 37,361 | 4,372 | 100,000 |
| Ending Cash (Net of O/S) | 13,254 | (42,120) | (30,619) | 8,667 | 17,019 | (23,726) | (9,926) | 42,281 | 14,345 | 37,361 | 4,372 | 36 | 36 |

## AVAILABILITY

| Accounts Receivable | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gross AR | 1,266,647 | 1,190,986 | 1,164,657 | 1,050,955 | 1,006,968 | 913,767 | 873,113 | 857,912 | 817,094 | 739,727 | 751,892 | 758,904 | 758,904 |
| Less: Inactive Over 120 | (151,065) | (151,065) | (151,065) | (151,065) | (151,065) | (151,065) | (151,065) | (151,065) | (151,065) | (151,065) | (151,065) | (151,065) | (151,065) |
| Less: active Over 120 | (135,493) | (127,389) | (124,583) | (112,420) | (107,715) | (97,745) | (93,396) | (91,770) | (87,404) | (79,128) | (80,429) | (81,180) | (81,180) |
| Less: Taint | (38,025) | (35,754) | (34,964) | (31,580) | (30,230) | (27,432) | (26,211) | (25,755) | (24,530) | (22,207) | (22,572) | (22,783) | (22,783) |
| Net A/R | 942,064 | 876,767 | 854,045 | 755,920 | 717,959 | 637,525 | 602,440 | 589,322 | 554,096 | 487,327 | 497,825 | 503,877 | 503,877 |
| Advance Rate | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% |
| A/R Availability | 753,651 | 701,414 | 683,236 | 604,736 | 574,367 | 510,020 | 481,952 | 471,458 | 443,276 | 389,861 | 398,260 | 403,101 | 403,101 |
| Revolver Balance | 999,608 | 999,608 | 999,608 | 999,608 | 999,608 | 999,608 | 999,608 | 999,608 | 999,608 | 999,608 | 999,608 | 999,608 | 999,608 |
| Availability/(Overadvance) | (245,957) | (298,194) | (316,372) | (394,872) | (425,241) | (489,588) | (517,656) | (528,150) | (556,332) | (609,747) | (601,348) | (596,507) | (596,507) |
| Cash net of OS Checks | 13,254 | (42,120) | (30,619) | 8,667 | 17,019 | (23,726) | (9,926) | 42,281 | 14,345 | 37,361 | 4,372 | 36 | 36 |
| Availability/Overadvance) net of cash | (232,703) | (340,314) | (346,991) | (386,205) | (408,222) | (513,314) | (527,582) | (485,870) | (541,987) | (572,386) | (596,975) | (596,471) | (596,471) |